E-FILED
Monday, 09 March, 2026 02:33:07 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### PEORIA DIVISION

JOSHUA B.,

     *Plaintiff*,

v.

COMMISSIONER OF SOCIAL
SECURITY,

     *Defendant*.

Case No. 1:24-cv-01494-RLH

## ORDER & OPINION

Plaintiff Joshua B. filed this suit to challenge an administrative law judge's finding that he is not disabled under the Social Security Act and thus ineligible to receive disability benefits. The parties have consented to final disposition of this case by a U.S. Magistrate Judge. (*See* Doc. 8.) Upon review, the Court finds that substantial evidence supports the ALJ's opinion, so the Court affirms.

## LEGAL STANDARDS

### I.       The Social Security Act

The Social Security Act—and the regulations adopted under it—explain in detail who is eligible to receive social security benefits. To qualify, a claimant must be sixty-five years of age, blind, or disabled. 20 C.F.R. § 416.202(a)(1)–(3). A claimant is disabled if she cannot "do any substantial gainful activity" because she suffers from "any medically determinable physical or mental impairment" that is either life-threatening or chronic. 42 U.S.C. § 423(d)(1)(A).

To implement that definition, the Social Security Administration has developed a five-step evaluation process. *See* 20 C.F.R. § 416.920(a)(1). The steps proceed sequentially:

> **Step One.** Is the claimant currently engaged in substantial gainful activity?
>
> **Step Two.** Does the claimant have a severe mental or physical impairment—i.e., an impairment that significantly limits their ability to do basic work activities—or a combination of them?
>
> **Step Three.** Does the mental or physical impairment appear on an enumerated list (called "listings")? If not, is it nonetheless medically equal to one of those listings?
>
> **RFC Assessment.** What is the claimant's residual functional capacity (RFC)—that is, the most they can still do despite their limitations?
>
> **Step Four.** Based on the claimant's RFC, can they perform their past work?
>
> **Step Five.** Based on the claimant's RFC, can they perform other work?

*See id.* § 416.920(a)(4)(i)–(v). The ALJ begins, of course, at step one. If it yields an affirmative answer (i.e., the claimant is working), the claimant is not disabled, and the inquiry ends. If step two yields a negative answer (i.e., the claimant does not have a severe impairment), the claimant is not disabled, and the inquiry ends. *See id.* §416.920(a)(4)(i)–(ii). Step three, however, is dispositive: If the claimant's impairment appears on a listing, the claimant is considered disabled and eligible for benefits. *See id.* § 416.920(a)(4)(iii). If the claimant's impairment does not appear on or medically equal a listing, the ALJ crafts an "RFC Assessment," which analyzes "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from [their] impairment." *Moore v. Colvin*, 743 F.3d 1118, 1121

(7th Cir. 2014). If either steps four or five yield an affirmative answer (i.e., the claimant can perform their old job or adjust to a new one in light of the RFC), the claimant is not disabled. *See* 20 C.F.R. § 416.920(a)(4)(iv)–(v).

The claimant has the burdens of production and persuasion through step four. *See Wilder v. Kijakazi*, 22 F.4th 644, 651 (7th Cir. 2022). At step five, the burden shifts to the Commissioner to show that the claimant can engage in some type of substantial gainful employment. *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).

## II.    Standard of Review

A court's function on review is limited to determining whether the ALJ's findings are supported by substantial evidence and based upon proper legal criteria. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, Courts may not try the case de novo or supplant the ALJ's factual findings with their own. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000). As such, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence, in turn, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (explaining that the threshold "is not high"); *Schneck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004) ("Substantial evidence may be less than the weight of the evidence, and more than a scintilla." (citation modified)). Yet, although the ALJ's

decision commands deference, courts may not simply "rubber stamp" it. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002).

The Seventh Circuit has emphasized that ALJs are "subject to only the most minimal of articulation requirements" and "need not address every piece or category of evidence identified by a claimant, fully summarize the record, or cite support for every proposition or chain of reasoning." *Warnell v. O'Malley*, 97 F.4th 1050, 1053 (7th Cir. 2024). Instead, ALJ's need only "provide an explanation for how the evidence leads to their conclusions that is 'sufficient to allow . . . a reviewing court, to assess the validity of the agency's ultimate findings and afford [the plaintiff] meaningful judicial review.'" *Id.* at 1054 (alteration in original) (quoting *Moore v. Colvin*, 743 F.3d 1118, 1121 (7th Cir. 2014)). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Secretary"—not the courts. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). Therefore, courts reviewing for substantial evidence may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [their] judgment for the ALJ's determination so long as substantial evidence supports" the decision under review. *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021). In short, the ALJ must build "an accurate and logical bridge" between the evidence in the record and his conclusions. *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013).

4

# BACKGROUND

## I.    Joshua

Joshua was born in 1978, (R. at 232[1]), and has received a high school education and an advanced locksmith certificate, (R. at 255). He has held various jobs, including as a metal scrapper, a welder, a roadside mechanic, and a caretaker. (R. at 256.) He was last employed in April 2017. (R. at 69.)

## II.    Procedural History

Joshua applied to the Social Security Administration for disability benefits in August 2022, alleging that he has been disabled since April 2017.[2] (R. at 16.) His application was initially denied in June 2023 and denied upon reconsideration the following October. (R. at 16.) He then requested a hearing before an ALJ, (R. at 16), which took place in February 2024, (R. at 55.) Present at that hearing were Josuha, his attorney, and a vocational expert. (R. at 55.)

After the hearing, the ALJ issued a written opinion concluding that Joshua was not disabled and therefore not entitled to disability benefits. (R. at 47.) In response, Joshua sought review of the ALJ's decision with the Appeals Council, but her request was denied. (R. at 1.) Joshua then filed a complaint in this Court to

---

[1] "R." refers to the Certified Administrative Record filed on February 6, 2025. (Doc. 6.) The page numbers cited in this Report and Recommendation refer to the black page numbers at the bottom right of the transcript, rather than the green page numbers generated automatically by CM/ECF at the top right of the page.

[2] Joshua also filed another application three years prior, which was denied at the initial level and upon reconsidered, and later denied by an ALJ. (R. at 17.) Joshua appealed to this Court, which affirmed the ALJ's denial in September 2022. (R. at 17.) This Court's denial of Josuha's prior application rendered the ALJ's October 27, 2020 decision "administratively final," as the ALJ below recognized. The ALJ also recognized, however, that the prior decision was not determinative of Joshua's disability status after October 28, 2020. (R. at 17.) Accordingly, the ALJ narrowed the "subject" of her decision to Joshua's disability (or lack thereof) following October 28, 2020. (R. at 17.)

challenge the ALJ's decision. (Doc. 1.) Joshua filed his motion for summary judgment in March 2025,[3] (Doc. 9), the Commissioner responded in May, (Doc. 12), and Joshua replied in June, (Doc. 13).

## III.    The ALJ's Decision

In her opinion, the ALJ used the five-step evaluation process outlined above to determine whether Joshua was disabled. At step one, she determined that Joshua had not engaged in "substantial gainful activity" since 2018, "well before the relevant period in this claim." (R. at 19.) At step two, the ALJ found that Joshua had the following severe impairments:

- Fibromyalgia;

- Neuropathy;

- Irritable bowel syndrome with hemorrhoids;

- Obesity;

- PTSD;

- ADHD;

- Dysthymia;

- Generalized anxiety disorder and social phobia; and

---

[3] Plaintiff filed his brief as a motion for summary judgment. In social security appeals, however, Rule 5 of Title XIV of the Federal Rules of Civil Procedure states that actions are "presented for decision by the parties' briefs." And it is settled that district-court review is limited to the four corners of the administrative record. *Cf. Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). It thus makes little sense to file a summary judgment motion: The question is not whether there are genuine disputes of material fact appropriate for trial, Fed. R. Civ. P. 56, but instead whether the ALJ's decision is supported by substantial evidence. *See Vaile v. Chater*, 916 F. Supp. 821, 823 (N.D. Ill. 1996) ("'[S]ummary judgment' may be inappropriate at the district court level in social security cases."). In any case, the Court construes Josua's motion for summary judgment as his opening brief. The Court also notes that Joshua's motion violates Civil Local Rule 5.1(A) because the document margins are smaller than one inch.

- Intermittent explosive disorder.

(R. at 19.) At step three, the ALJ concluded that none of those impairments met or medically equaled any of the listed impairments. (R. at 21.) Before proceeding to steps four and five, the ALJ crafted the following RFC assessment:

> [Joshua] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he is limited to performing simple and routine tasks and making no more than simple work-related decisions. He can have no more than occasional work-related interaction with coworkers or supervisors, and he is limited to tasks performed away from the general public. There should be no strict hourly production expectations. The work environment should be static in nature so the tasks remain the same and are unchanging.

(R. at 25.) At step four, the ALJ found that Joshua cannot perform any of his past relevant work. (R. at 45.) Finally, at step five, the ALJ concluded that Joshua's RFC would allow him to perform jobs in the national economy, including "mail clerk," "small products assembler," "inspector," and "loader, semi-conductor dyes." (R. at 46.) Based on the ALJ's conclusion at step five, she determined that Joshua is not disabled. (R. at 47.)

## DISCUSSION

Joshua challenges the ALJ's opinion on three grounds. First, he argues that the ALJ failed to adequately explain why she did not include more mental limitations in Joshua's RFC. Second, he argues that the ALJ ignored Joshua's physical impairments, including his fibromyalgia, in concluding that he could sustain the on-task requirements of full time work. And third, he argues that the ALJ improperly rejected the conclusions of two treating sources. As the Commissioner observes, Joshua's arguments amount to little more than a plea to reweigh the evidence. But

the Social Security Act takes that option off the table. Instead, this Court's inquiry begins—and ends—with the observation that the ALJ's findings were supported by substantial evidence and that she minimally articulated her rationale.

Before turning to Joshua's arguments, the Court briefly discusses an ALJ's obligations when conducting an RFC assessment. As stated, the RFC refers to "the claimant's ability to do physical and mental work activities on a regular and continuing basis despite limitations from [her] impairment." *Moore*, 743 F.3d at 1121. That determination involves two steps. First, the ALJ must "consider whether there is an underlying 'determinable physical or mental impairment that could reasonably be expected to produce the [claimant's] symptoms.'" *Schneck*, 357 F.3d at 701 (quoting SSR 96-7p). If there is, the ALJ must then "evaluate the 'intensity, persistence, and functionally limiting effects of the symptoms'"—that is, the extent to which the claimant's symptoms limit her ability to work. *Id.* (quoting *Stevenson v. Charter*, 105 F.3d 1151, 1154 (7th Cir. 1997)). Here, the ALJ determined that Joshua's impairments "could be expected to cause the alleged symptoms." (R. at 28.) That finding triggered the second step in crafting the RFC, which required the ALJ to evaluate the extent to which Joshua in fact experiences symptoms that limit his ability to work. Although couched in different terms, Joshua's challenges all target this step of the ALJ's analysis.

## I.    Challenge 1: The ALJ Improperly Excluded Certain Mental Limitations in Joshua's RFC

Joshua first observes that some evidence in the record demonstrates that he has difficulty sustaining conversations. (Pl. Br. 10–11.[4]) This evidence, Joshua argues, undermines the ALJ's conclusion at step three that Joshua has only "moderate" limitations in concentrating, persisting, and maintaining pace (CPP)—a conclusion Joshua characterizes as "tenuous." (Pl. Br. 11.) According to Joshua, the ALJ compounded this error in crafting his RFC because she simply "rested" on it and "failed to provide a more detailed assessment of . . . mental functioning" as it relates to Joshua's ability to work. (Pl. Br. 11.) The Court disagrees.

At step three of her analysis, the ALJ concluded that Joshua has "moderate" CPP limitations. (R. at 23.) As the ALJ recognized, some evidence supported a degree of limitation in this area, including evidence that (1) Joshua strayed off topic during his intake interview with a representative from the administration; (2) he has difficulty following directions, communicating, understanding, and completing tasks; and (3) he becomes upset, yells, and fights with coworkers, friends, and family. (R. at 23–24.) But the evidence was not one-sided: Other evidence suggested that Joshua could perform daily activities with certain limitations, that his attention at doctor's visits was more often than not "fair or adequate," and that he reported in 2023 and 2024 that medication improved his attention. (R. at 24.)

Joshua's argument that the ALJ's conclusion at step three was "tenuous" is therefore supported by little more than Joshua's opinion that the ALJ should have

---

[4] "Pl. Br." refers to Joshua's motion for summary judgment, filed March 7, 2025. (Doc. 9.)

attributed more severe CPP limitations. But this Court is not bound by Joshua's opinion; it is bound by the Social Security Act, which prohibits it from "reweigh[ing] the evidence, resolv[ing] debatable evidentiary conflicts, determine[ing] credibility, or substitute[ing] [its] judgment for the ALJ's determination." *Gedatus*, 994 F.3d at 900. As the Commissioner observes, Joshua's argument is essentially a plea to "reweigh the evidence." (Comm'r Br. 5.[5]) But because there is evidence that a "reasonable mind would accept" to show moderate—but not marked—CPP limitations, this Court must defer to the ALJ. *Richardson*, 402 U.S. at 401.

Similarly, Joshua asserts that "the ALJ cancelled out notations of significant deficits in attention" and "dismissed" Joshua's "episodes as irrelevant"—a failure Joshua describes as an "unexplained" "leap in logic." (Pl. Br. 11.) But it is Joshua's logic that does not track: If the ALJ simply dismissed Joshua's claims out of hand, then how could she have found any CPP limitations at all? Indeed, the regulations explain that CPP limitations are classified into five levels of severity: (1) no limitations, (2) mild, (3) moderate, (4) marked, or (4) extreme. *See* 20 C.F.R. Part 404, Subpart P, App'x 1. And a moderate limitation, the regulations explain, means that a claimant's functioning in a given area "independently, appropriately, effectively, and on a sustained basis is fair." *Id.* A moderate limitation is thus greater than "slightly limited" but less than "seriously limited." Implicit in the ALJ's step-three conclusion, therefore, is that Joshua's CPP abilities fall between slightly and seriously limited. Joshua offers no compelling reason to disturb this finding.

---

[5] "Comm'r Br." refers to the Commissioner's response brief, filed May 28, 2025. (Doc. 12.)

In a related argument, Joshua faults the ALJ for not "provid[ing] a more detailed assessment of work-related mental functioning for purposes of assessing" Joshua's RFC. (Pl. Br. 11.) He then cites portions of the record that demonstrate that Joshua exhibited "rapid speech, anxious mood, and tangential thought process," along with other symptoms of mental impairments. The ALJ erred, Joshua says, because she simply acknowledged the existence of this evidence but failed to "wrestle with how [it] might affect" Joshua's ability to "sustain any work-related tasks on a full-time basis." (Pl. Br. 12.) Again, the Court disagrees.

To start, Joshua is correct that much of the ALJ's RFC analysis consists of summarizing the medical record rather than analyzing its implications. And if that were all the ALJ did, this Court would reverse. *See Clifford*, 227 F.3d at 872 (explaining ALJs must "build an accurate and logical bridge from the evidence to his conclusion"). But it is not. Indeed, most of the ALJ's analysis of Joahua's mental impairments is found in her discussion of the various medical opinions offered in the case. For instance, the ALJ discussed at length—and ultimately rejected—an opinion by Lawrence Yee, a licensed clinical professional counselor. (*See* R. at 41–43.) In doing so, the ALJ explained that his opinion that Joshua would be unable to maintain attention and concentration for 30% or more of an eight-hour workday was "not persuasive in the least," in part because it was not supported by the medical records. (R. at 42.) The ALJ explained that "the mental health records . . . generally indicate normal memory and cognition and often indicate normal or at least fair/adequate attention, as well as normal thought content and at least fair insight and judgment."

11

(R. at 43.) The ALJ elaborated that extreme restrictions on Joshua's ability to "ask[] simple questions and request[] assistance" was "contradicted by the treatment records, where the claimant asks about changing or modifying medications, asks providers to complete paperwork to support his disability claim, asks about treatment options, etc.." (R. at 43.) The ALJ further observed that "more often than not," Joshua "displayed appropriate hygiene and grooming, and . . . was cooperative and interacted appropriately with treating providers." (R. at 43.) Although the ALJ recognized that Joshua "did tend to talk over his providers and it could be hard to keep him focused," she observed that Joshua "was not physically or verbally aggressive or inappropriate, was not causing disturbances in the waiting room or the exam room, etc." (R. at 43.) The ALJ thus concluded that "the evidence of record better supports only . . . moderate limitations in interacting with others and in concentration, persistence, or maintaining pace." (R. at 43.)

The ALJ did not "fail to explain her findings," as Joshua suggests. Instead, she approached her RFC analysis by summarizing the medical record, analyzing the various opinions, and compared the limitations offered by those opinions to her interpretation of the medical evidence. Joshua does take issue with this approach. Nor could he: The Seventh Circuit has held that an ALJ's analysis in one portion of their opinion may provide support for their conclusions in another. *Cf. Zellweger v. Saul*, 984 F.3d 1251, 1255 (7th Cir. 2021) ("[T]he magistrate judge was wrong to think he was barred from considering the whole of the ALJ's decision."). Nor is it appropriate for this Court to "nitpick" an ALJ's decision. *Poole v. Kijakazi*, 28 F.4th

792, 797 (7th Cir. 2022) The ALJ's analysis of the medical opinions here provides the requisite "logical bridge" between the medical evidence of Joshua's mental limitations and the ALJ's RFC assessment. *Roddy*, 705 F.3d at 638.

Joshua also observes that the complexity of a task is unrelated to a person's ability to perform it for a sustained period of time—put differently, someone with difficulty concentrating may be unable to sustain work *regardless* of how simple or complex the work may be. That is true so far as it goes, and the Seventh Circuit has so held. *See Martin v. Saul*, 950 F.3d 369, 373 (7th Cir. 2020) ("[T]he relative difficulty of a specific job assignment does not necessarily correlate with a claimant's ability to stay on task or perform at the speed required by a particular workplace."). But Joshua's argument assumes its conclusion. Joshua assumes that the ALJ was required to find that he had difficulty concentrating, which in turn would have warranted additional restrictions in his RFC. *See id.* Yet as discussed, the ALJ explained why she did not find substantial CPP limitations. And because an RFC assessment need only include limitations "supported by the medical record." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015) (citation omitted), the ALJ did not err by omitting those limitations that were not.

## II.    Challenge 2: The ALJ Inadequately Discussed Joshua's Physical Impairments, Including His Fibromyalgia

Joshua's application was previously denied by an ALJ in October 2020. *See Joshua B. v. Saul*, No. 1:21-cv-01172, Dkt. 26 (Sep. 28, 2022). In that decision, the ALJ found that none of Joshua's physical impairments were severe. *Id.* at 4. Accordingly, the ALJ found that Joshua had the RFC to "perform a full range of work

at all exertional levels," subject to a handful of non-exertional limitations. *Id.* But the second time around (in the decision now under review), the ALJ *did* find that Joshua had severe physical impairments, including Fibromyalgia, Neuropathy, Irritable bowel syndrome with hemorrhoids, and Obesity. (R. at 19.) It follows that the ALJ's RFC assessment should reflect that disparity. Joshua argues that the ALJ's RFC assessment here did not—in particular, because the ALJ did not consider how his physical impairments may or may not exacerbate his mental limitations. (Pl. Br. 12–14.) The Court disagrees.

As an initial matter, the ALJ explicitly addressed this point. She recounted the prior ALJ's findings and explained how her RFC reflects the additional evidence of Joshua's physical limitations:

> The prior ALJ decision issued October 27, 2020, found the claimant to have no severe physical impairments. Additionally, the ALJ decision found the claimant's severe mental impairments limited the claimant to the performance of simple and routine tasks, and simple work-related decisions; occasional interaction with coworkers and supervisors but no contact with the general public; and the ability to tolerate only occasional changes in a routine work setting. As set forth above, the established residual functional capacity for October 28, 2020, to the present incorporates the same or similar restrictions, *as well as some additional restrictions, especially as the undersigned finds the evidence of record now establishes severe physical impairments.*

(R. at 28 (emphasis added).) Those "additional restrictions"—above what the prior ALJ found—included finding that Joshua was limited to light work (as opposed to work at all exertional levels). This demonstrates that the ALJ was plainly aware of the prior ALJ's findings and that she incorporated additional limitations based on new evidence. It also shows that the evidence of Joshua's severe physical impairments not only led the ALJ to include additional exertional limitations, but

14

also non-exertional ones—namely, the prohibition on "strict hourly production expectations"—absent from the prior ALJ's decision. For that reason, Joshua's suggestion that the ALJ failed to "wrestle . . . in any way" with additional evidence of his physical impairments is unfounded. (Pl. Br. 13.)

Joshua points to several pieces of evidence that his physical impairments impede not only his ability to perform physical tasks but also his ability to meet the psychological demands of full-time work. (Pl. Br. 13.) But Joshua's observation that some of the evidence points in other directions does little to move the needle. There is no requirement that the ALJ must "address every piece or category of evidence identified by a claimant." *Warnell*, 97 F.4th at 1053. Even so, as the Commissioner observes, the ALJ did not ignore the evidence that Joshua cites to support his challenges. (*See, e.g.*, R. at 32 (discussing Joshua's "anxiety, frustration, and anger"); R. at 37 (irritable bowel syndrome); R. at 37 – 38 (ability to complete activities of daily living); R. at 27 (discussing bathroom issues).) Accordingly, the ALJ did not "ignore an entire line of evidence" that undermined her conclusions. *Grotts v. Kijakazi*, 27 F.4th 1273, 1278 (7th Cir. 2022). Without that kind oversight, this Court must defer to the ALJ's findings.

In a similar vein, Joshua contends that the ALJ "failed to properly assess" his fibromyalgia and widespread pain because she did not include enough limitations in the RFC to accommodate them. (Pl. Br. 14.) As Joshua concedes, the ALJ "obviously recognized" that Joshua suffered from fibromyalgia—she concluded at step two that it was among his severe impairments. (R. at 20.) In doing so, she also found that

sciatica was not among Joshua's severe impairments, instead attributing Joshua's "pain in his back (as well as his extremities)" to his fibromyalgia. (R. at 20.) Joshua reads this as a *concession* by the ALJ that Joshua's fibromyalgia has a "wide-ranging impact." (Pl. Br. 14.) But rejecting Joshua's allegation of sciatica is not a concession at all; it is merely an observation that particular symptoms are attributable to another cause. In any case, the ALJ discussed Joshua's fibromyalgia at several points in her opinion. (*See, e.g.*, R. at 20; R. at 37; 38; *see also, e.g.*, R. at 39 (discussing medications and treatment for Joshua's fibromyalgia).) Although Joshua asserts that his fibromyalgia limited his lifting and carrying abilities, the ALJ clearly credited his allegations on this point: His RFC was limited to "light work," defined by the regulations as involving "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). And the remainder of Joshua's argument—i.e., that Fibromyalgia limits his ability to sit, stand, walk, reach, and manipulate—relies entirely on a medical opinion that the ALJ explicitly rejected. As explained below, the ALJ acted within her discretion in doing so.

## III.    Challenge 3: The ALJ Improperly Rejected Two Medical Opinions

Joshua's final challenge is that the ALJ should have accepted the opinions of two treating sources: Dr. Miller and Lawrence Yee. But the ALJ articulated her reasons for rejecting those opinions. Since her conclusion was not patently wrong, Joshua's argument fails.

Historically, a treating physician's opinion was entitled to controlling weight, so long as it was supported by medical findings and consistent with other evidence in the record. *See Clifford*, 227 F.3d at 870. But as Joshua recognizes, the Social Security Administration eliminated that rule in 2017. *Susan T.W. v. Saul*, No. 18-cv-1720, 2020 WL 3077591, at *3 n.4 (N.D. Ill. June 10, 2020) (citing 20 C.F.R. § 404.1520c). Accordingly, for claims filed after March 2017 (like Joshua's), ALJs must assess medical opinions in light of several factors. *See* 20 C.F.R. § 404.1520c. Those factors include: (1) supportability, meaning the objective medical evidence on which the opinion is grounded; (2) consistency with other evidence; (3) the physician's relationship to the claimant; and (4) the physician's bona fides. *See id.* § 404.1520c(c)(1)–(5). Unsurprisingly, the supportability and consistency of an opinion are the most important. *See id.* § 404.1520c(a).

Start with Dr. Rhett Miller. He treated Joshua two to three times per year, beginning in 2009. In October 2022, he completed a "Medical Evaluation" report and opined on Joshua's work-related limitations. Among them, Dr. Miller found that Joshua's reaching, handling, and fingering capacity was limited, (R. at 2063); that he could never balance or crawl, and only occasionally climb ladders, scaffolds, stairs and ramps, (R. at 2064); that he could occasionally stoop, kneel, and crouch, (R. at 2064); that he has "marked" limitations in carrying out complex instructions, interacting with the public, coworkers, and supervisors, (R. at 2067); and moderate limitations in understanding, remembering, and carrying out simple instructions, (R. at 2067). The ALJ, however, found Dr. Miller's conclusions "largely lacking in

persuasive value." (R. at 40.) For one thing, the ALJ recognized that portions of the opinion were internally inconsistent: "Dr. Miller answered 'No' to the question asking if the claimant's impairments affected his hearing or vision" and also "'No' to the questions asking if the claimant retained the ability to hear and understand simple oral instructions and to communicate simple information . . . ." (R. at 40.) Another problem with the opinion the ALJ identified was that Dr. Miller "set forth significant restrictions on the questionnaire" based on "only generalized muscle pain and hemorrhoids." (R. at 41.) Dr. Miller "specifically noted the claimant had no loss of motion of the joints, no deficiencies in hand manipulation, and no weakness in the extremities." (R. at 41.) The ALJ also found the opinion "unsubstantiated by the evidence of record"—for example, because the evidence demonstrated that Joshua was able to "understand the instructions given by Dr. Miller and other treating providers, has routinely told Dr. Miller and other treating providers about his health problems and concerns, . . . and [Joshua] has called the offices of his various providers as needed to request paperwork be completed, express concerns, or request medications."[6] (R. at 40.)

Dr. Lawrence Yee also offered a medical opinion in the form of a "Functional Capacity" questionnaire. He suggested that Joshua was significantly restricted in

---

[6] Joshua contests this finding because "every provider at one time or another has explicitly stated that Joshua has not been able to communicate effectively with them. (Pl. Br. 15.) True, some evidence in the record suggests that Joshua lacks the ability to do so. And the ALJ recognized as much: In one case, for example, a nurse was "barely able to talk" to Joshua because he completely dominated the conversation. (R. at 32.) But again, some evidence leans the other way: For example, at a May 11, 2021 therapy session, Joshua "was alert and oriented, cooperative and casually dressed. He displayed motor stiffness but normal speech." (R. at 32.) This Court is not entitled to reweigh it. *See Herr*, 912 F.2d at 181.

18

several categories of mental functioning, including his ability to "carry out short and simple instructions," "understand and remember detailed instructions," and "perform activities within a schedule." (R. at 41; R. at 2011–13.) The ALJ also rejected this opinion as "not persuasive in the least" because, among other things, it was "unsupported by [Mr. Yee's] counseling notes or the treatment notes from the claimant's psychiatrist." The ALJ also found that Mr. Yee's conclusion that Joshua was completely unable to function outside the home" inconsistent with a questionnaire that Joshua himself completed in April 2023, in which he indicated that he "did his own grocery shopping and . . could go places alone." (R. at 42.)

All told, the ALJ rejected Dr. Miller's and Mr. Yee's opinions because they were either internally inconsistent, because the significant restrictions proposed were not supported by the medical record, or both. *See also Clifford*, 227 F.3d at 871 (explaining that "internal inconsistency" is a permissible reason to reject the opinion of a treating physician, so long as the ALJ explains the inconsistency); *see also Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995) ("Medical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence" in the record.). And under the substantial evidence standard, an ALJ need only provide "some idea of why" they refuse to adopt medical opinions. *Spicher v. Berryhill*, 898 F.3d 754, 758 (7th Cir. 2018). The ALJ here discharged that obligation.[7]

---

[7] As the Commissioner observes, the ALJ instead largely credited the opinions of the state-agency psychologists in concluding that Joshua "could perform simple but not complex tasks with modified social demands." (Comm'r Br. 4.) Joshua does not challenge the ALJ's reliance on those opinions.

## CONCLUSION

Joshua's Motion for Summary Judgment, (Doc. 9), is DENIED. The Commissioner's decision is AFFIRMED. The Clerk is DIRECTED to enter judgment and close this case.

*So ordered.*

Entered this 9th day of March 2026.

s/ Ronald L. Hanna
Ronald L. Hanna
United States Magistrate Judge